

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————

No. 02-22-00154-CV

———————————————

IN THE INTEREST OF A.K. AND J.K., CHILDREN

---

On Appeal from the 78th District Court
Wichita County, Texas
Trial Court No. DC78-CP2020-2337

---

Before Bassel, Womack, and Wallach, JJ.
Memorandum Opinion by Justice Bassel

## MEMORANDUM OPINION

After a jury trial, the trial court signed a judgment terminating the parental rights of appellant E.C. (Father) and appellant K.C. (Mother) to their two children, Ann and Bruce.[1]  In separate briefs, both parents contend that the evidence was legally and factually insufficient to establish by clear and convincing evidence that terminating their respective parental rights was in their children's best interest.  We affirm the trial court's judgment.

## I.  Background

According to the affidavit supporting the Department of Family and Protective Services' original petition, shortly after midnight on Saturday, November 7, 2020, the police responded to a verbal disturbance between Father and Mother while Ann and Bruce were present.  In November 2020, Ann was three years old, and Bruce was two years old.  According to the police, Father and Mother each accused the other of being under the influence of narcotics.  After obtaining consent to search the home, the police found a pipe used to smoke marijuana and a clear plastic baggie that they suspected was used to package narcotics.  Mother had an outstanding warrant for family-violence assault, so the police arrested her.  As for the children, the police released them into the care of Paternal Grandmother.

---

[1]We use aliases to identify the children, and we identify family members by their relationship to the children.  *See* Tex. Fam. Code Ann. § 109.002(d); Tex. R. App. P. 9.8(b)(2).

That same day, the Department investigator went to the county jail where she met with Mother, who asserted that Father had a methamphetamine problem and that she and Father would fight anytime she found methamphetamine in their home. Mother denied currently using methamphetamine herself but admitted having previously abused methamphetamine, heroin, and prescription pills. Mother stated that the children would be safe with Paternal Grandmother but expressed concerns if they were returned to Father.

From the jail, the investigator went to the family's residence where she spoke with Father. He maintained that the verbal dispute was over allegations that he had cheated on Mother. According to Father, during the altercation Mother was either under the influence of methamphetamine or experiencing a postpartum depression crisis. Despite the argument, Father informed the investigator that he intended to bond Mother out of jail the next day. He did not know of anyone with whom the Department could place the children.

That evening, Paternal Grandmother contacted the investigator to explain that she would not be able to care for Ann and Bruce. Paternal Grandmother related to the investigator that neither Father nor Mother could get off drugs. She thought that Father had perhaps been sober a week but that Mother was actively abusing methamphetamine.

The Department thus removed Ann and Bruce,[2] and on the following Monday, November 9, 2020, it filed an "Original Petition for Protection of a Child, for Conservatorship, and for Termination in Suit Affecting the Parent–Child Relationship." On the same date, the trial court signed an "Order for Protection of a Child in an Emergency and Notice of Hearing" in which it appointed the Department as the children's temporary managing conservator.

After three days of evidence, the jury deliberated an hour and twenty minutes and returned its verdict terminating both Father's and Mother's parental rights. Within the verdict, the jury found grounds for terminating Mother's parental rights under Subsections (D), (E), (O), and (P) of Section 161.001(b)(1) of the Texas Family Code.[3] For Father, the jury found those four grounds plus one more—Subsection (L)

---

[2]Father maintained that the Department removed the children from him while Mother was in jail and that the reason for the removal was Father's intent to bond Mother out of jail. If true, then Paternal Grandmother returned the children to Father later that same day. The Department's petition asserts that it removed the children on November 7, 2020, but the supporting affidavit does not specify from whom the Department removed them.

[3]Subsection (D) involves an endangering environment. Tex. Fam. Code Ann. § 161.001(b)(1)(D). Subsection (E) entails endangering conduct. *Id.* § 161.001(b)(1)(E). Subsection (O) deals with failure to comply with a court order setting out the actions necessary to obtain a child's return. *Id.* § 161.001(b)(1)(O). And Subsection (P) addresses the use of a controlled substance in a manner that endangers a child and the failure to complete a substance-abuse program or, having completed a substance-abuse program, the continued use of a controlled substance. *Id.* § 161.001(b)(1)(P).

4

of Section 161.001(b)(1) of the Texas Family Code.[4]  For both parents, the jury found that termination was in their children's best interest.  *See* Tex. Fam. Code Ann. § 161.001(b)(2).

## II.  Legal Principles

### A.  Generally

In a termination case, the State seeks not just to limit parental rights but to erase them permanently—to divest the parent and child of all legal rights, privileges, duties, and powers normally existing between them, except the child's right to inherit. *Id.* § 161.206(b); *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985).  Consequently, "[w]hen the State seeks to sever permanently the relationship between a parent and a child, it must first observe fundamentally fair procedures."  *In re E.R.*, 385 S.W.3d 552, 554 (Tex. 2012) (citing *Santosky v. Kramer*, 455 U.S. 745, 747–48, 102 S. Ct. 1388, 1391–92 (1982)).

Termination decisions must be supported by clear and convincing evidence. *See* Tex. Fam. Code Ann. §§ 161.001(b), .206(a); *In re E.N.C.*, 384 S.W.3d 796, 802 (Tex. 2012).  Due process demands this heightened standard because "[a] parental rights termination proceeding encumbers a value 'far more precious than any property right.'"  *E.R.*, 385 S.W.3d at 555 (quoting *Santosky*, 455 U.S. at 758–59, 102 S. Ct. at 1397).  Evidence is clear and convincing if it "will produce in the mind of the trier of

---

[4]Subsection (L) requires a conviction or community supervision for specified offenses involving harm to a child.  *Id.* § 161.001(b)(1)(L).  In Father's case, it was for sexual assault of a child.  *Id.* § 161.001(b)(1)(L)(vi).

fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code Ann. § 101.007; *E.N.C.*, 384 S.W.3d at 802.

For a trial court to terminate a parent–child relationship, the party seeking termination must establish, by clear and convincing evidence, that (1) the parent's actions satisfy just one of the many predicate grounds that are listed in Subsection 161.001(b)(1) of the Texas Family Code and (2) termination is in the child's best interest. Tex. Fam. Code Ann. § 161.001(b)(1), (2); *E.N.C.*, 384 S.W.3d at 803; *In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005).

## B. Legal Sufficiency

In evaluating the evidence for legal sufficiency in parental-rights-termination cases, we determine whether the evidence is such that a factfinder could reasonably form a firm belief or conviction that the Department proved both the particular ground for termination and that termination was in the child's best interest. *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002); *see In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005). We review all the evidence in the light most favorable to the finding and judgment, and we resolve any disputed facts in favor of the finding if a reasonable factfinder could have done so. *J.F.C.*, 96 S.W.3d at 266. We also must disregard all evidence contrary to the finding that a reasonable factfinder could have disbelieved, in addition to considering undisputed evidence even if it is contrary to the finding. *Id.* That is, we consider evidence favorable to termination if a reasonable factfinder could, and we disregard contrary evidence unless a reasonable factfinder could not.

6

*See id.* In doing our job, we cannot weigh witness-credibility issues that depend on the witness's appearance and demeanor; that is the factfinder's province. *J.P.B.*, 180 S.W.3d at 573. And even when credibility issues appear in the appellate record, we defer to the factfinder's determinations as long as they are not unreasonable. *Id.*

## C. Factual Sufficiency

We must perform "an exacting review of the entire record" in determining whether the evidence is factually sufficient to support terminating a parent–child relationship. *In re A.B.*, 437 S.W.3d 498, 500 (Tex. 2014). In a factual-sufficiency review, we give due deference to the factfinder's findings and do not supplant the judgment with our own. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). We determine whether, on the entire record, a factfinder could reasonably form a firm belief or conviction that the parent violated an alleged ground and that termination was in the child's best interest. Tex. Fam. Code Ann. § 161.001(b); *see In re C.H.*, 89 S.W.3d 17, 25 (Tex. 2002). If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction in the truth of its finding, then the evidence is factually insufficient. *H.R.M.*, 209 S.W.3d at 108.

## D. Best Interest

There is a strong presumption that keeping a child with a parent is in the child's best interest. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006). We review the entire

7

record to determine the child's best interest. *In re E.C.R.*, 402 S.W.3d 239, 250 (Tex. 2013). Evidence that is probative of grounds under Section 161.001(b)(1) may also be probative of best interest under Section 161.001(b)(2). *Id.* at 249; *C.H.*, 89 S.W.3d at 28. Nonexclusive factors that the factfinder in a termination case may also use in determining the child's best interest include:

- the child's desires;

- the child's emotional and physical needs now and in the future;

- the emotional and physical danger to the child now and in the future;

- the parental abilities of the individuals seeking custody;

- the programs available to assist these individuals to promote the child's best interest;

- the plans for the child by these individuals or by the agency seeking custody;

- the stability of the home or proposed placement;

- the parent's acts or omissions that may indicate that the existing parent-child relationship is not a proper one; and

- the parent's excuse, if any, for the acts or omissions.

*Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976); *see E.C.R.*, 402 S.W.3d at 249; *E.N.C.*, 384 S.W.3d at 807. These factors do not form an exhaustive list, and some factors may not apply to some cases. *C.H.*, 89 S.W.3d at 27. Furthermore, undisputed evidence of just one factor may suffice in a particular case to support a finding that termination is in the child's best interest. *Id.* On the other hand, the presence of paltry evidence relevant to each factor will not support such a finding.

*Id.*; *In re C.G.*, No. 02-20-00087-CV, 2020 WL 4518590, at *7 (Tex. App.—Fort Worth Aug. 6, 2020, pet. denied) (mem. op.); *In re J.B.*, No. 02-18-00034-CV, 2018 WL 3289612, at *4 (Tex. App.—Fort Worth July 5, 2018, no pet.) (mem. op.).

### III. Discussion

Neither parent contests the jury findings on the grounds of termination. *See* Tex. Fam. Code Ann. § 161.001(b)(1). Rather, each contests the jury findings that termination was in their children's best interest. *See id.* § 161.001(b)(2).

### A. Children's desires

At the time of the 2022 trial, Ann was almost five years old, and Bruce was still several months away from his fourth birthday. Both lacked sufficient maturity to express an opinion regarding a parental preference, and neither testified at trial. *See In re M.S.*, No. 02-21-00007-CV, 2021 WL 2654143, at *18 (Tex. App.—Fort Worth June 28, 2021, pet. denied) (mem. op. on reh'g); *In re M.H.*, 319 S.W.3d 137, 150 (Tex. App.—Waco 2010, no pet.); *see also* Tex. Fam. Code. Ann. § 153.134(a)(6) (providing that a child must be at least twelve years old before the child's preference, if any, regarding the person to have the exclusive right to designate the child's primary residence becomes a factor), § 156.101(a)(2) (same). This factor is neutral.

### B. Children's emotional and physical needs now and in the future

Both Ann and Bruce were autistic special-needs children. Both were delayed in their speech and were receiving speech therapy. Bruce had a genetic disorder, medium-chain acyl-CoA dehydrogenase (MCAD) deficiency, that prevented his body

9

from breaking down certain fats and that thus required a special diet. Both were receiving occupational therapy, which the children's caseworker described as therapy designed to help them developmentally.

This factor, by itself, is neutral. However, the children's extreme youth and special needs place a premium on parental abilities and the stability of their home.

## C. Emotional and physical danger to the children now and in the future

### 1. The present investigation was the Department's third for Father and Mother

Father and Mother had a history of endangering first Ann and later, after Bruce's birth, both Ann and Bruce. The Department investigator testified that the Department had investigated Father and Mother on three occasions.

#### a. Ann's birth in 2017

The first occasion was when Ann was born in 2017; both Mother and Ann tested positive for methamphetamine. Father and Mother agreed to place Ann with Paternal Grandmother and, further, to voluntarily work services with the Department's Family Based Services. Mother completed her services and obtained sobriety; in contrast, Father continued to test positive for methamphetamine. The Department returned Ann to Mother, and with the Department's approval, both Mother and Ann moved to Washington, where Mother had family. Father remained in Texas. As Mother explained to the jury, "They told me as long as I left him, I

10

didn't go back to him, that there was no danger, there was no reason for [the Department] to be involved." The Department then closed the case.

### b. The eye-socket incident—August 2020

The second occasion was in August 2020. By this time, Ann was three years old, and Bruce was two years old. Both children were in the home when Mother's eye socket was broken, and Bruce had either been in the room when the incident happened or had entered the room shortly thereafter.

The investigator asserted that Father had assaulted Mother and that Mother had said that Father had been using methamphetamine and had been diagnosed with bipolar disorder and post-traumatic stress disorder (PTSD).[5] Father, for his part, asserted that Mother had assaulted him and that when he grabbed her, they both fell, and Mother injured herself in the fall. Father commented, "I don't see how in the hell that could have happened." Father maintained that Mother had injured her eye socket when her head hit his in the fall. He maintained his back was hurt in the same incident.

---

[5]Father was prescribed Depakote, a mood stabilizer, *see In re G.F.*, No. 02-21-00267-CV, 2022 WL 524138, at *4 n.8 (Tex. App.—Fort Worth Feb. 22, 2022, pet. denied) (mem. op.), and Trazadone, a psychotropic medication used to treat depression, *see J.B. v. Tex. Dep't of Fam. & Protective Servs.*, No. 03-21-00325-CV, 2021 WL 5456653, at *1 (Tex. App.—Austin Nov. 17, 2021, pet. denied) (mem. op.). He was not taking his medications at the time of trial.

Father said that both he and Mother were arrested for assault, but he filed an affidavit of nonprosecution, so the charge against Mother was dismissed. Father's situation was otherwise; the assault charge against him remained pending.

### c. The November 7, 2020 incident

After the eye-socket incident, Mother and the children left Texas for Washington. Their stay in Washington was, however, temporary. The caseworker thought that Mother and the children had returned on October 24, 2020. Father testified that Mother and the children had returned to Texas and him in November 2020. In any event, a short time thereafter, the Department launched its third investigation, the current one based on the events that occurred on November 7, 2020—the verbal altercation, the drug pipe, and Mother's arrest on a warrant.

## 2. Methamphetamine use

Methamphetamine use, by both Father and Mother, posed a danger to the children. Father admitted being a methamphetamine addict. Mother bonded Father out of jail on January 14, 2022. Father admitted using methamphetamine the very first day that he was out.

Mother initially maintained that she did not know if she had a drug problem. When pressed, however, she denied having one.

On the other hand, she admitted using methamphetamine a month or two before trial. Regarding Mother's drug use, the caseworker said that Mother had multiple positive drug screens for methamphetamine throughout the case and that

Mother's use had worsened as the case progressed. The record shows that Mother tested positive for methamphetamine based on urine samples taken on January 26, 2021; March 10, 2021; and September 17, 2021. The record also shows that Mother tested positive for methamphetamine based on hair samples taken on April 8, 2021; August 2, 2021; and March 3, 2022. Because Mother failed to submit to drug screens on June 9, 2021; June 30, 2021; October 7, 2021; February 14, 2022; March 2, 2022; and March 18, 2022, she was deemed to have tested positive on those dates as well.

Drugs and their effect on a person's ability to parent may qualify as an endangering course of conduct. *In re M.M.*, No. 02-21-00185-CV, 2021 WL 5227177, at *5 (Tex. App.—Fort Worth Nov. 10, 2021, no pet.) (mem. op.) Further, evidence that a parent continued to use illegal drugs even though the parent knew that his or her parental rights were in jeopardy is conduct showing a voluntary, deliberate, and conscious course of conduct that endangers a child's well-being. *Id.* Because using drugs exposes children to the possibility that the parent may be impaired or imprisoned, their use may support termination. *Id.* Grounds for termination under Section 161.001(b)(1) may also be probative when determining best interest under Section 161.001(b)(2). *E.C.R.*, 402 S.W.3d at 250.

### 3. Violence

And then there is the issue of domestic violence. A factfinder could reasonably conclude that the broken-eye-socket incident resulted from domestic violence. Father did not dispute that there was a verbal argument. Father similarly did not dispute that

there was physical violence; indeed, he maintained that Mother had assaulted him. Mother, however, was the person who ended up with a broken eye socket. Three months later, the police responded to another domestic dispute. During both incidents, the children were in the home.

Father also had a pending assault charge. He was accused of assaulting John Doe,[6] whom Father suspected was having relations with Mother. When the Department asked Father about John Doe, Father pleaded his Fifth Amendment right not to testify. In a civil case, such as this one, a factfinder may draw negative inferences from a party's assertion of the privilege against self-incrimination. *In re B.B.*, Nos. 02-19-00250-CV, 02-19-00251-CV, 2020 WL 1057308, at *2 (Tex. App.—Fort Worth Mar. 5, 2020, no pet.) (mem. op.).

Domestic violence, lack of self-control, and a propensity for violence may be considered as evidence of endangerment. *In re B.K.*, No. 02-21-00175-CV, 2021 WL 5848769, at *5 (Tex. App.—Fort Worth Dec. 9, 2021, pet. denied) (mem. op.). Abusive or violent conduct can produce a home environment that endangers a child's well-being. *In re J.I.T.P.*, 99 S.W.3d 841, 845 (Tex. App.—Houston [14th Dist.] 2003, no pet.).

---

[6]Out of an abundance of caution, we use an alias for this person.

### 4. Father's failure to register as a sex offender

In December 2021, Father went to jail for failure to register as a sex offender.[7] Because that case was still pending, Father invoked his Fifth Amendment right against self-incrimination. *See In re A.B.*, 372 S.W.3d 273, 275 (Tex. App.—Fort Worth 2012, no pet.). As with the assault involving John Doe, because this termination proceeding was civil, the jury could draw adverse inferences from Father's pleading the Fifth. *See B.B.*, 2020 WL 1057308, at *2.

A parent's criminal history can support a finding of endangerment. *In re J.F.-G.*, 627 S.W.3d 304, 313 (Tex. 2021). As part of a parent's criminal history, factfinders can take into account the nature of the crimes, the duration of incarceration, and whether a pattern of escalating, repeated convictions exists. *Id.*

### 5. Parental visits and their impact on Ann's behavior

Evidence also suggested that Father's and Mother's visits with Ann impacted her behavior negatively:

> Q. [BY THE DEPARTMENT] Okay. Does [Ann] have a change of behavior after visitations?
>
> A. [BY FOSTER MOTHER] Absolutely.

---

[7]In October 1999, Father committed the offense of sexual assault of a child, and in January 2001, Father pleaded guilty and was placed on deferred adjudication community supervision for ten years. Father admitted pleading guilty to digitally penetrating the sexual organ of his four-year-old sister when he was seventeen years old, but he maintained that he pleaded guilty only so that he could get out of jail. Before the year was out, in November 2001, Father was adjudicated guilty and sentenced to six years' confinement in the penitentiary. Father had violated his community supervision by committing a burglary.

Q. With one parent or both parents?

A. Um, both.

Q. Let's start with [Father].

. . . .

Q. . . . . What -- What are [Ann's] behaviors after visits with [Father]?

A. When she's seen just [Father] that day, alone, she is more defiant and more aggressive.

Q. Okay. When she's seen [Mother]?

A. She reverts to baby-like behaviors and regresses.

The children's attorney ad litem pursued this line of questioning, and Foster Mother gave more details:

Q. [BY THE ATTORNEY AD LITEM] . . . . After visitations, do you see any change in [Ann's] behavior?

A. [BY FOSTER MOTHER] Yes, sir.

Q. And can you explain to the jury what those changes are?

A. Typically, they are baby-like regressive stages. She will try to steal a bottle from the baby. She will even grab a pacifier, put it in her mouth. She will begin babbling again. She will want you to even hold her and rock her like a baby sometime[s]. There'[re] other times that she will get real[ly] aggressive and defiant. She will throw -- Just this past week, she threw a toy at my kid's head, the nine-year-old.

Q. These -- Do these changes in behavior that you testified to occur frequently after visitations?

A. Yes, more so since . . . May or June . . . .

16

For Ann, the parental visits were destabilizing. *See In re J.C.W.*, No. 09-21-00231-CV, 2022 WL 174541, at \*10 (Tex. App.—Beaumont Jan. 20, 2022, pet. denied) (mem. op.) (noting regressive behavior after visits); *In re B.N.*, No. 10-09-00216-CV, 2010 WL 3434214, at \*3 (Tex. App.—Waco Sept. 1, 2010, no pet.) (mem. op.) (noting violent behavior after visits).

The evidence showed that Father and Mother posed an emotional and physical danger to their children. This factor weighs in favor of termination.

## D. Parental abilities of the individuals seeking custody

The Department had no concerns about Paternal Grandmother or Foster Mother. In contrast, the Department had many concerns—primarily drug use and domestic violence—about returning the children to Father and Mother.

This factor weighs in favor of termination.

## E. Programs available to assist these individuals to promote the children's best interest

The trial court issued an order setting out the actions necessary to obtain the children's return, and the jury found that both Father and Mother had failed to comply with it. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(O). Neither Father nor Mother contests those findings. Consequently, both Father and Mother had already been given opportunities to work services designed to teach them the skills needed to parent their children safely, and both had failed to take advantage of them.

We acknowledge that Father and Mother worked some services. For example, both completed parenting classes. Additionally, Father completed an anger management program and participated in individual counseling for about six months, although he was ultimately unsuccessfully discharged. Father remained employed for the most part, attended the majority of his visitations, and was appropriate during those visitations. As for Mother, she engaged in substance-abuse counseling and individual counseling, but she was unsuccessfully discharged from the latter. Mother also completed a domestic violence class and, to an extent, maintained legal employment. Like Father, she attended the majority of her visitations and was appropriate during them. But after nearly a year and a half, both parents had failed to show that they had learned the skills necessary to provide a safe and appropriate home for the children. Assuming services were available after the trial, the record suggests that neither Father nor Mother would profit from them.

This factor weighs in favor of termination.

**F. Plans for the children by these individuals or by the agency seeking custody**

Ann had been placed with a foster family that wanted to adopt her. Bruce had been placed with Paternal Grandmother; she wanted to adopt him. Because both Ann and Bruce were special-needs children, the Department had not found a placement that was willing to take both children. Nevertheless, the foster family and Paternal Grandmother worked at ensuring that Ann and Bruce spent time together.

For example, Bruce had spent weekends with Ann and her foster family, and Ann had spent weekends with Bruce and Paternal Grandmother's family.

When Father was asked whether he had any plans for the children if they were returned to him, he responded, "Right now? I kind of don't . . . . I mean, I would need help right now. No, right now, I am not good to take my kids. I'm not." Mother too acknowledged that she was not, at that time, able to offer Ann and Bruce a safe and stable home. The Department had removed Ann and Bruce in early November 2020, but in late March 2022, neither parent was in a position to provide the children a safe and stable home.

This factor weighs in favor of termination.

## G. Stability of the home or proposed placement

### 1. Father and Mother

At the time of trial, Father was homeless. To the caseworker's knowledge, Mother had lived in at least three different locations. Mother maintained that at one time she had her own apartment, but she moved out because, as she explained, the landlord was "nitpicking" and insisted that she pay her rent in full. Initially, Mother moved in with a co-worker, but she later lived with a friend. The caseworker, after asking Mother's friend about her criminal history, had concerns and did not consider Mother's friend's home a safe and appropriate environment for the children. At trial, Mother maintained that she had leased a house and was planning on moving into it once the trial was over.

Since the case began, Mother had four different jobs. She had worked at Valero, Dollar Saver, Subway, and McDonald's. At one time, Father had jobs at Century Tent, A-1 Rentals, and a furniture store. Father maintained that he had lost his employment when he was arrested for failure to register as a sex offender in late December 2021 and, thereafter, remained jailed until the middle of January 2022 when Mother bonded him out. At trial, Father asserted that he was self-employed. When asked what kind of work he did, he responded,

> Woodworking. I tile floors. I can make your house. I can -- I mean, I'm very talented at a lot of different things. I have an[] NCCER certificate, National Center for Construction and Educational Research. I'm a trim and upholstery technician. I'm a collision finisher technician. I'm like -- I've been a plumber. I do a lot of handyman work.

Father nevertheless was homeless.

## 2. Adoptive placements

In contrast, the adoptions would provide both Ann and Bruce stability. Both children were very bonded in their placements. Both placements could meet Ann's and Bruce's special needs. And both placements could provide the children with drug-free, safe, and stable homes.

This factor weighs in favor of termination.

**H. (1) Parents' acts or omissions that may indicate that the existing parent–child relationship is not a proper one and (2) parents' excuses, if any, for their acts or omissions**

### 1. Methamphetamine

Father admitted using methamphetamine throughout the case. He even admitted using methamphetamine three days before trial. He also acknowledged that he was an addict.

But according to Father, not everything about his drug use turned out poorly: "Those kids were born because -- because we did drugs. We would have never met. We would have never talked or -- the kids wouldn't have been -- these kids wouldn't have been born if it weren't for drugs."

Father maintained that he and Mother were functional methamphetamine users until the Department removed the children:

> A. [BY FATHER] I'm trying -- [w]e did drugs the entire time. And if we never missed any appointments -- [t]hose kids never missed any appointments. They always had diapers, always had wipes, always had food and a shelter over their head.
>
> Q. [BY DEPARTMENT] So you're saying the entire time, the entire lifetime of the children, you guys were using drugs?
>
> A. Since before they were born, but not like we are now.
>
> Q. So --
>
> A. It's never been this bad.
>
> Q. Are you saying you were functional methamphetamine users until the children were taken?

A. Yeah, and not on a daily basis; just occasionally.

Minimizing the danger that methamphetamine posed to Ann and Bruce, Father denied that he or Mother ever used methamphetamine around the children and explained that he and Mother would take turns, "We'd alternate. If she wanted to get high, I'd take the children[,] and she'd get high." Father insisted, "We didn't do drugs around the kids." On the other hand, Father admitted that he was the person who gave Mother the methamphetamine when she was pregnant with Ann. He commented, "I regret that."

Father had not gone to rehab. He had, however, by his count, gone to Narcotics Anonymous at least five times.

Mother was receiving substance-abuse counseling at the time of trial. Her counselor acknowledged, however, that not everyone who seeks drug treatment wants genuinely to "kick their habit." Her counselor also agreed that admitting a drug problem might be the first step in treatment. Mother's counselor stated that he thought that Mother was serious about addressing her drug problem, but he qualified his statement by saying that he was optimistic about all his clients "until they prove[d] otherwise." He added, "But, you know, [Mother and I] just -- we've just gotten started, so I've got no reason to think otherwise."

A factfinder could have reasonably questioned the sincerity of Mother's attempt to stop using methamphetamine. Mother had, after all, denied having a problem with methamphetamine. Other evidence showed that Mother was capable of

22

deceit: she admitted using synthetic urine in an attempt to falsify the results of one of her drug tests.

## 2. Methamphetamine and danger

Mother acknowledged that someone on drugs was dangerous, but she pointed out that Father, when sober, posed no danger: "When [Father's] sober, I don't think that he's a danger to any kids. Um, anybody on drugs, I wouldn't let -- you know, they're unpredictable, so you obviously wouldn't want them around children by themselves or whatever. But, no, I don't think he's a danger when he's sober." When the children's attorney pressed the matter, however, Mother admitted that Father was a danger to the children when he was high:

> Q. [BY ATTORNEY AD LITEM] So to flip that, when he's not sober, when he's high on methamphetamine, he's a danger to these kids, isn't he?
>
> A. [BY MOTHER] When anybody is high on methamphetamines, they're unpredictable; therefore, a danger to any child.
>
> Q. So [Father], when he's on methamphetamine, is a danger to the children? That's a "yes" or "no" question.
>
> A. Yeah.

Mother even conceded that when she was high, she was a danger to the children, but she minimized the danger by saying that she was not high very often:

> Q. [BY THE DEPARTMENT] Okay. So you said when anyone is on meth, they are a danger to children, didn't you?
>
> A. [BY MOTHER] Unpredictable, therefore --

23

Q. So when you're on meth, you're a danger to children?

A. Uh, anybody. I mean, I could agree with that.

. . . .

Q. And you relapsed often?

A. No.

### 3. Domestic violence

Father denied that there was any domestic violence on his or Mother's part. He maintained that even the eye-socket incident was an accident. He agreed that a home with domestic violence is not a safe one for children.

Like Father, Mother denied any domestic violence. And like Father, Mother even disputed whether domestic violence was responsible for her broken eye socket—but unlike Father, she hedged just a bit:

Q. [BY MOTHER'S ATTORNEY] When your orbital bone was fractured, do you know how that was done?

A. [MOTHER] Um, I don't. I mean, I was -- I threw my arms up and I don't know. Like, I blacked-out.

Q. [Father] said he hit you with his chin. Does that sound about right?

A. I don't know for sure. I hope so. I don't want to believe that he punched me in the eye, but, I mean -- [.]

### 4. Whether Father and Mother were still a couple

Father and Mother both maintained that they were no longer in a relationship. Father testified on one occasion that they had stopped being in a relationship three or

four months before trial and, on another occasion, about a year before trial. Mother denied that they were in a romantic relationship and maintained that their relationship was limited to co-parenting. She asserted that their relationship had ended about a year earlier. The caseworker, however, believed that Father and Mother's relationship was ongoing.

Mother admitted wanting Father to have another chance to get clean but denied that—if the children were returned to her—she would let Father see the children if he was not sober. Mother's history, however, suggested the contrary.

In the earliest investigation—the one initiated in 2017 after Ann's birth when both Mother and Ann had tested positive for methamphetamine—Mother and Ann went to Washington with the Department's approval. Subsequently, Mother and Father had another child—Bruce—in 2018, who was born in Washington. At some point, Mother, Ann, and Bruce were all in Texas with Father. We know this because there was a second investigation in Texas.

In the second investigation—the eye-socket incident in August 2020—after the Department became involved, Mother again went to Washington; this time she took both children. Unlike the previous time, however, Mother did so without the Department's approval. The caseworker commented, "It's concerning when a family leaves the state, yes, in the middle of an investigation." Mother denied fleeing the state. She maintained that she went to Washington to have surgery on her eye socket. She explained, "I needed help with the children . . . . I needed support. . . . I was

gonna have surgery." When asked why she did not leave Ann and Bruce with Father, she responded that she took care of her kids and that she was being protective.

Regardless of the explanation, Mother and the children were back in Texas with Father by late October or early November 2020—shortly before the November 7, 2020 incident. Mother explained that she returned to Texas with the children based on Father's assurances that he was sober, although she later learned that Father's assurances were false: "I was . . . under the impression that he was sober before I came back. When I came back and realized he wasn't, I was ready to go back." She gave the same explanation when asked why she had bonded Father out of jail:

> Q. [BY THE DEPARTMENT] Who bonded [Father] out of jail?
>
> A. [MOTHER] I did.
>
> Q. Why?
>
> A. Same thing, really. He promised me he was going to be sober. He promised -- [h]e wanted to change. He wanted to do things right. He was tired of letting the kids down. And . . . I just gave him the benefit of the doubt, really. He promised to pay me back.
>
> Q. How many times do you think he's promised you that he's changed?
>
> A. Probably too many.
>
> Q. And as recently as January, you've fallen for it, right?
>
> A. More or less.

As noted earlier, Father admitted using methamphetamine the same day that he bonded out of jail.

A factfinder could reasonably question whether Father and Mother's purported separation was just a ploy. By separating on two occasions in the past, Father and Mother had previously successfully retained their parental rights.

### 5. Evidence supporting Father and Mother

In Mother's brief, she asserts that the evidence was undisputed that she exhibited numerous favorable parental behaviors. At trial, Father spoke highly of Mother's parental abilities. When Mother's attorney asked Father what kind of mom she was, Father answered, "A damn good one." We agree that the evidence showed that Mother and Father loved Ann and Bruce. No one disputed that Father and Mother were aware of Bruce's MCAD deficiency and had adjusted his diet accordingly. And no one disputed that both parents behaved appropriately during visits. But both were attempting to parent while using drugs and engaging in domestic violence.

### 6. Conclusion

When the Department removed Ann and Bruce, the Department had concerns about domestic violence in Father and Mother's relationship and about Father's and Mother's use of drugs. About a year and a half later, a reasonable factfinder could have concluded that those concerns persisted. This factor weighs in favor of termination.

27

## I.  Holding

Paramount in the upbringing of a child are stability and permanence.  *In re Z.C.*, 280 S.W.3d 470, 476 (Tex. App.—Fort Worth 2009, pet. denied) (per curiam). Neither Father nor Mother could offer either child stability or permanence.

Neither parent could provide a safe home.  The factfinder was not required to believe that Mother had succeeded in leasing a house just as her termination trial was winding down.  Even if Mother had leased a house, a reasonable factfinder could have concluded that Mother's home would not be safe, given Mother's drug use and given her relationship with Father, or that the leased house might be a temporary reprieve, given Mother's previous failure to pay the rent.

Father and Mother denied domestic violence.  A factfinder, however, is not compelled to believe uncontradicted testimony that is suspicious or that comes from a biased or an interested source.  *M.S.*, 2021 WL 2654143, at \*16.  Father's and Mother's denials belied the fact that the police were called to their home in August 2020 and again in November 2020 for domestic disturbances, one of which—the August 2020 eye-socket incident—involved serious injuries to Mother and other injuries to Father.  Additionally, Father had two pending assault charges, one against Mother and the other against John Doe.

Both Father and Mother had ongoing issues with methamphetamine.

We hold that the evidence is legally and factually sufficient to show that terminating Father's and Mother's parental rights was in the best interest of Ann and

Bruce. *See J.F.C.*, 96 S.W.3d at 265–66; *In re C.W.*, No. 02-21-00252-CV, 2022 WL 123221, at *13 (Tex. App.—Fort Worth Jan. 13, 2022, no pet.) (mem. op.) (addressing legal and factual sufficiency on best interest); *In re R.W.*, 627 S.W.3d 501, 506, 516–18 (Tex. App.—Texarkana 2021, no pet.) (same); *see also In re M.R.*, 243 S.W.3d 807, 820–21 (Tex. App.—Fort Worth 2007, no pet.) (holding evidence factually sufficient to support best-interest finding because parents exposed children to domestic violence and drug abuse, mother had failed to obtain housing and employment, and children flourished in foster care). We overrule Father's and Mother's sole issues.

## IV. Conclusion

Having overruled Father's and Mother's issues, we affirm the trial court's judgment.

/s/ Dabney Bassel

Dabney Bassel
Justice

Delivered: September 29, 2022